THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* DIMAS ORTIZ MORALES, Defendant and Appellant. SAME *v.* SAME.

Nos. 8607 and 8608. Argued June 18, 1941.—Decided June 27, 1941.

*Carlos García Méndez* for appellant. *George A. Malcolm, Attorney General,* and *R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Justice Travieso delivered the opinion of the court.

Two separate complaints were filed against Dimas Ortiz Morales in the Municipal Court of San Germán: one for aggravated assault and battery, and the other for unlawfully carrying a revolver used in the commission of the aggravated assault. In the former he was charged with having assaulted Fernando Mercado with a revolver, firing two shots at him but missing him. He was convicted of both offenses, and feeling aggrieved by the judgments whereby he was sentenced to pay a fine of $50 on the charge of assault and to one month's imprisonment in jail on the charge of carrying a weapon, he took these two appeals which we will determine in a single opinion herein.

Both appeals are based on a single assignment in which it is claimed that the lower court committed manifest error of fact and of law in convicting the defendant without sufficient evidence to support the allegations of the complaints and without taking into consideration defendant's evidence.

We will make a summary of the evidence of both sides.

Fernando Mercado testified that on the day of the occurrence he was driving an automibile along the public road from Lajas to San Germán; that upon reaching Kilometer 4, Hectometer 4, of said road, he had an accident in which he struck a man whose name was Luis Ortiz Ramírez, defendant's father, who later died; that on alighting from the car to pick up the injured man, the defendant appeared and fired a shot at him with a nickel-plated revolver, but the witness could not state whether it was a large or a small re-

volver, that the defendant came downhill from a little house on the road and fired the first shot at him but missed; that the shot was fired at him on the road while he was picking up the wounded man. On cross-examination by the defense he stated that when he first saw the defendant the latter was already on the road and coming up walking; that when the defendant fired the first shot at him he made a turn on the road and then defendant ran and he also ran; that after the revolver was taken away from him, the defendant called him and both picked up the father, got into the car and took the wounded man to the hospital in town where he died.

María Collado, upon being examined by the district attorney, testified: That she was traveling in the car driven by Fernando Mercado in the direction of San Germán and saw when the car killed a man while crossing the road; that she saw Dimas Ortiz firing two shots at Mercado with a nickel-plated pistol; that she heard two shots. On cross-examination by the defendant, she stated that, after the first shot, she stayed in the car, but that when a second shot was fired she went away; that she did not know whether the weapon was a pistol or a revolver, nor did she know its caliber.

The district attorney and the defendant stipulated that the other witnesses for the prosecution, if called to testify, would make similar statements as María Collado had made. Thus was closed the evidence for the prosecution, the weapon not having been produced as the same had not been seized.

After a motion to dismiss the prosecution, on the ground that the weapon had not been identified in a clear and convincing manner, had been denied, counsel for the defense stated its theory "that the defendant was not conscious of the acts he was committing." In support of that theory the following testimonial evidence was produced:

Luis Camacho Rivera, a clerk in the office of the Internal Revenue Collector of Lajas, testified that on the day of the occurrence, while passing by the place of the accident, he saw the automobile strike defendant's father and throw him into the ditch; that when they were going to see the condition of the injured man, he noticed that the defendant was coming down from the house across the highway, where he lived, but that he was coming down "in an unconscious state"; that the defendant was not coming down in a violent mood but in an unconscious state, and that then they said to him: "Dimas, wait a moment; let us go and find out what is the matter with your father"; that his attitude at the time was that of a madman, fully unconscious; that they seized and subdued him, and like someone coming out of a dream he was saying: "Who was the chauffeur? Who was the chauffeur?"; that he was told who was the chauffeur and he then got into the car with him and went to the hospital; that the defendant held a revolver in his hands and fired the two shots into the air, completely unconscious; that on being told that his father was alive he quieted down; that when the defendant was coming from the house, which was at a distance of about 30 meters, he carried a revolver. On being cross-examined by the district attorney, he insisted that the two shots were fired by defendant into the air, before reaching the road and within the farm; that on his attention being called, the defendant reacted and that he became calm when told that his father could survive.

The defendant testified in his own behalf: That he was waiting for his father to have breakfast as usual; that he saw how the car that was coming uphill struck his father and threw him into the ditch; that then he saw no more, heard no more; that he became aware of what happened when on crossing over to the edge of the road his friends were saying to him: "Your father is still alive, he may survive"; that he then asked: "Who is the chauffeur?" and they told him that it was Fernando Mercado, and he then said to Mer-

cado "Come on, let us carry him to the hospital," and they went away together, unaccompanied by others. On cross-examination by the district attorney, he stated that he spoke after the event with the chauffeur without quarreling with him; that he was aware of having fired some shots at the chauffeur and of having seen him, but that is all that he remembered; that when he stood on the balcony of the house he was not carrying the revolver; that he did not know how or when he armed himself with the revolver nor whether he had used the revolver against the chauffeur.

Dr. Nelson Perea, testifying as psychiatric expert, reported at length on what is called "temporary insanity" or "sudden attack of madness," and said:

"Such madness, which is commonly called temporary insanity or sudden attack of madness, almost always comes immediately after an agitation or shock; an agitation stimulates the suprarenal glands which secrete a fluid that is carried rapidly by the blood stream and produces a contraction of the blood vessels all over the body, especially in the brain where it causes a temporary cerebral anemia which may result in a semi-conscious state lasting for several minutes. Such symptoms appear in a person and produce high blood pressure, paleness, excitement, and temporary insanity. During such moment of temporary insanity the subject appears to be in a semi-conscious state.

"  *          *          *          *          *          *          *

"Q.—The defendant not being armed, the fact of his going into the house, of arming himself with a revolver, of covering the intervening distance and firing several shots, is it unconsciously that use is made of the revolver and the shots are fired?

"A.—Yes, Sir. Just as he seized a revolver he might have seized a knife or something else. Immediately upon witnessing the event a suprarenal secretion takes place. Such secretion occurs immediately and the person goes mad and at that moment he may arm himself with a revolver or he may behave in several ways, but such acts are committed in an abnormal condition, in a semi-conscious state.

"Q.—Is unconsciousness produced immediately?

"A.—He becomes unconscious immediately as a result of the suprarenal secretion."

The evidence which we have just examined is clear and convincing and, in our opinion, sufficient to support the two judgments of conviction appealed from. The whole of the evidence for the prosecution, as well as that for the defense, establishes beyond all doubt the essential fact that the accused, while on the public road, fired two revolver shots at the driver of the car that struck his father.

Without being psychiatric experts ourselves, we know that it is logical and natural for a normal human being to feel an irresistible impulse and desire to punish or even to take the life of any person who has injured or killed a dear one. We are human and frail and we realize that if similarly placed we might also become victims to our own passions and impulses.

No citizen has the right to take the law in his own hands. The irresistible impulse that drives a person to commit an act of violence against someone who has injured or killed a dear one may, or perhaps should be considered by the court as a mitigating circumstance, but never as one exonerating such person from guilt. See *People* v. *Echeandía,* 23 P.R.R. 521; *People* v. *Nazario,* 53 P.R.R. 226; *People* v. *Hoin,* 62 Cal. 120.

The minimum penalties imposed in both cases clearly show that the trial court considered that the circumstances under which defendant had committed the acts mitigated his guilt.

Both judgments must be affirmed.